IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------x
ARTESANIAS HACIENDA REAL S.A. de C.V.,:
                              Plaintiff      : Civil Action
      -against-                     :
                                            : Case No. 16-cv-04197-EGS
NORTH MILL CAPITAL LLC and     :

LEISAWITZ HELLER,                  :
                          Defendants    :
---------------------------------------------x

**REPLY MEMORANDUM OF LAW OF PLAINTIFF ARTESANIAS HACIENDA REAL S.A. de C.V. IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT NORTH MILL CAPITAL, LLC ON PLAINTIFF'S FIRST COUNT FOR "AIDING AND ABETTING BREACH OF FIDUCIARY DUTY OWED ARTESANIAS AS CREDITOR OF INSOLVENT CORPORATION WILTON" IN PLAINTIFF'S RESTATED SECOND AMENDED COMPLAINT**

 

BARRY L. GOLDIN, ESQ. (PA #58692)
3744 Barrington Drive
Allentown, PA 18104-1759
Tel: 610-336-6680
Email: barrygoldin@earthlink.net
*Attorney for Plaintiff Artesanias
Hacienda Real S.A. de C.V.*

[Although this Court's Stipulated Order (Doc. 137) states this Reply Memorandum is not due until Monday, April 11, 2022, plaintiff Artesanias has expedited earlier filing of this Reply Memorandum so it may be reviewed by the Court in advance of oral argument, which the Court has now scheduled for Thursday, April 14, 2022 (Doc. 147)].

Plaintiff Artesanias Hacienda Real S.A. de C.V. ("Artesanias" or "AHR") submits this Reply Memorandum in further support of its Rule 56 Motion for Summary Judgment [ECF Doc. 135 et seq.] against defendant North Mill Capital LLC ("North Mill") on the First Count in Artesanias' Restated Second Amended Complaint ["SAC" (ECF Doc. 100 ¶¶110-117)] as to North Mill's liability for "aiding and abetting breach of fiduciary duties owed Artesanias as creditor of insolvent corporation Wilton".

1. <u>North Mill Did Not Timely Respond to, and So Should Be Deemed to Have Admitted All Statements in Artesanias' Statement of Material Facts.</u>

This Court's Policies and Procedures include Rule II(E)(4) governing "Motions for Summary Judgment". In accordance with that Rule's first paragraph, Plaintiff Artesanias' summary judgment motion papers included a Statement of Material Facts as to which Plaintiff contends there is no genuine issue to be tried [("SUMF") Doc. 135-2].

Pursuant to that Rule's second paragraph, defendant North Mill was required to admit or deny each numbered paragraph in the SUFM. This Court's Rule so states:

> "A party opposing a motion for summary judgment shall file a separate, short, and concise statement responding to the numbered paragraphs set forth in the moving party's statement of undisputed facts **and shall either concede the facts as undisputed or state that a genuine dispute exists**. If the opposing party asserts a genuine dispute exists as to any fact, the party shall cite to the specific portion(s) of the record that create the dispute, including the exhibit, page, and line number. The opposing party shall also set forth in enumerated paragraphs any additional facts that the party contends preclude summary judgment. **All facts set forth in the moving party's statement of undisputed facts shall be deemed admitted unless controverted.**" [emphasis added]

That Rule mirrors the local rule followed for many years in the Middle District (and other courts), and approved and followed by the Third Circuit Court of Appeals. *See Mearin v. Folino*, 654 Fed. Appx. 58, 61 (3rd Cir. 2016); *Smith v. Addy*, 343 Fed. Appx. 806, 808 (3rd Cir. 2009); *Boykin v. Bloomsburg University of Pennsylvania*, 893 F.Supp.

1

400, 403-4 (M.D. Pa. 1995) (deems admitted movant's statement of facts which opponent did not properly deny), citing *Childers v. Joseph*, 842 F.2d 689, 694-95 (3rd Cir. 1998).

By stipulated Order [Doc. 137], North Mill's response to Artesanias' summary judgment motion (including the SUMF response) was due by March 25, 2022; but North Mill did not file its SUMF Response until April 5 – eleven days late. See *Rossi v. Progressive Ins.*, 813 F. Supp. 2d 643, fn. 1 (M.D. Pa. 2011), which held such a late-filed response to a SUFM would not be considered. Thus, North Mill's late-filed SUMF-response should not be considered; all SUMF statements should be "deemed admitted".

2. <u>Key Facts in the SUMF and Elsewhere in the Record.</u>

Key facts in the SUMF or elsewhere in the record include (among others) that:

(i) Jeffery was CEO, director, and sole shareholder of Pennsylvania corporation Wilton Armetale, Inc. ("Wilton") [SUMF #B];

(ii) Wilton was in default in its obligations to and unable to pay North Mill and other creditors; Wilton was insolvent; and in light of Wilton's insolvency, Jeffery was fiduciary to not only Wilton but also to Wilton creditors such as Artesanias (judgment creditor for more than $900,000 against both Wilton and Jeffery)[SUMF #B, U, AA-BB, DD-EE];[1]

(iii) under Pennsylvania law, Jeffery (as fiduciary of insolvent Wilton and its creditors) was required to give notice to and obtain approval of creditors to any usurpation of corporate opportunity or other transaction involving Wilton as to which fiduciary Jeffery would personally benefit [plaintiff's moving Memorandum [Doc. 135-1, §III(2)(B)]; but

---

[1] Because Wilton was in default of obligations to North Mill, Jeffery had no right under his Junior Participation Agreement to veto any action North Mill took or omitted to take [Ex. 4 §8]. Instead, Jeffery's approval for license or sale of Wilton assets was required as he was CEO/sole director/sole shareholder of insolvent Wilton and so fiduciary to Wilton and its creditors [see plaintiff's moving Memorandum (Doc. 134-1 at fn.s 5, 6 & 7); SUMF #N & O].

2

(iv) North Mill negotiated, arranged, and entered into a secret amendment with fiduciary Jeffery granting him personally the "upside" to be paid *pari passu* 20% of net proceeds of sale of Wilton's real estate (instead of his being subordinated to payment of North Mill in full), in consideration for fiduciary Jeffery's consent to sale of all Wilton's non-real estate assets to Gordon Brothers for a below-market price of only $725,000 and payment of all sale proceeds directly to North Mill [SUMF #UU through MMM].

3. <u>North Mill Arranged and Agreed to the Tainted Junior Participation Agreement Amendment for the Bribe to Jeffery.</u>

North Mill continues to ignore Pennsylvania's standard jury instruction for "commercial bribery", which states the statutory elements [18 Pa. C.S.A. §4108(a) (see Ex. 60)] as:

> (i) he [Jeffery] was a fiduciary of the principal;
> (ii) he agreed to accept a benefit from North Mill upon an understanding that the benefit would influence his conduct in relation to the affairs of his principal; and
> (iii) he acted without the consent of his principal.[2]

With respect to the first element, North Mill does not dispute Jeffery as a matter of law was fiduciary to both insolvent corporation Wilton and its creditors [SUMF HH].

As to the second element, North Mill testified to negotiating, and Jeffery agreed to accept, a benefit influencing his conduct in relation to his principal (the tainted participation agreement amendment for him to be paid 20% of net proceeds *pari passu* of sale of Wilton real estate) in consideration for approving and signing, as insolvent Wilton's fiduciary, below-market sale of Wilton non-real estate assets for only $725,000 and payment of all sale proceeds directly to North Mill [SUMF #UU through MMM].

As to the third element, Jeffery acted without "consent" of his principals -- as he owed fiduciary duties to and could not lawfully "consent" on behalf of insolvent principal

---

[2] *U.S. v. Parise, Jr.*, 159 F.3d 790, 799-803 (3d Cir. 1998), citing *U.S. v. Johns*, 742 F. S. 196, 220 (E.D. Pa. 1990) (commercial bribery and kickbacks); *U.S. v. Harder*, 168 F.S. 3d 732, 743-744 (E.D Pa. 2016).

3

Wilton to his own bribe-related misconduct, and likewise never sought or obtained any such "consent" from creditor Artesanias [§III(2)(B) of Artesanias' moving Memorandum].[3] Rather, that amendment agreement was kept secret.

North Mill thus aided and abetted Jeffery's criminal violation by negotiating, facilitating, and agreeing to Jeffery's tainted bribery agreement [SUMF #UU-MMM].

4. <u>Under Pennsylvania Law, Bribery Is Against Public Policy and Actionable in Tort.</u>

Pennsylvania case law recognizing bribery as a civil tort. *See In re Brown*, 557 B.R. 363, 375 (Bankr. E.D. Pa. 2016), permits conspiracy claim for violation of "duty to not engage in commercial bribery", citing *A & L Precision Products v. Alloy Bellows & Precision Welding, Inc.*, 2009 WL 2959608 at *7 (W.D. Pa. 2009) for "recognizing that allegations implicating commercial bribery are actionable in tort".[4] Defendants argue Jeffery did not ultimately receive a cash payment under that tainted agreement. But receipt of cash is not a statutory element; rather soliciting, establishing, facilitating, or agreeing to that tainted amendment with fiduciary Jeffery invoked the bribery statutes.

5. <u>North Mill Did Not Have the Right to Pay a Bribe to Nor Otherwise Assist Fiduciary Jeffery to Breach His Fiduciary Duties to Insolvent Wilton and Its Creditors.</u>

North Mill now seeks to justify its tainted bribe agreement with Jeffery by arguing that "its agreement with Jeffery was a necessary part of its effort to preserve the

---

[3] The Travel Act [18 U.S.C. §1952] felonies include to so "promote, manage, establish, carry on, or facilitate ... any unlawful activity" -- that term "unlawful activity" being defined to include "bribery ... in violation of the laws of the State in which committed".

[4] *A & L Precisions Products, Id* at *7, held bribery of and conspiracy with a corporate employee, paid to divert corporate resources for benefit of his briber, violated "duties imposed as a matter of social policy and embodied in the law of torts" and therefore "actionable in tort" under Pennsylvania law; similarly, *Westlake Plastic Co. v. O'Donnell, III*, 182 F.R.D. 166, 170-71 (E.D. Pa. 1998), held employer asserted a 18 Pa.C.S.A. §4108(a) claim for employee's solicitation/agreement to accept a bribe (an interest in an entity to which he allegedly directed an exclusive distributorship of employer products).

4

value of Wilton's assets"; "Jeffery's approval was necessary for a liquidation sale to take place"; "Jeffery refused to provide that consent without participating in the sale of Wilton's real estate" and North Mill was "acting in its own self-interest" [North Mill Opp. Memo (Doc. 141-13 at p. 26)]. But, the reason bribes are solicited, paid, and received (as is true generally of theft, fraud, embezzlement or other financial crime) is "self-interest" of the perpetrators. The purpose of the Pennsylvania and federal statutes which criminalize commercial bribery (and other financial crime) and related tort doctrines has been and is public policy to prohibit, deter and penalize perpetrators from engaging for their "self-interest" in such misconduct (whether by entering into, soliciting, promoting, agreeing to, or otherwise facilitating such misconduct). Thus, there is no exception in the bribery or other such criminal statutes for "self-interest".

Nor is "self-interest" a valid defense for breach of fiduciary duty -- as the fiduciary duty of loyalty is meant to restrict such "self-interest". [See the statutes and case law cited in Artesanias' moving Memorandum at §III(1), 2(A) & 2(B), pp. 7-10].

6. <u>The Sale to Gordon Brothers Was Below Market Value.</u>

North Mill ignores that on Saturday, February 13, 2016, a Leisawitz-drafted email in Jeffery's name requested Vagabond submit a revised "non-binding letter of intent" by Monday, February 15.[5] On February 15, Vagabond so delivered its email proposing to purchase Wilton non-real estate assets (brand name, inventory and receivables) for an

---

[5] See that Jeffery email (written by Charles Phillips of Leisawitz) stating (as part of the email chain attached to Artesanias' SAC as Exhibit 12G [at p. 5] and SUMF #NN:
> "Our lender has given us a deadline of Monday, February 15, 2016 at 4:00 PM (EST) within **which Letters of Intent must be submitted by prospective purchasers.** ... you need to submit **a term sheet or letter of intent** by the deadline on Monday. **The letter of intent can be** very simple and **of course, non-binding, but your expression of interest must be confirmed no later than Monday.** ..." [emphasis added]

5

estimated $1,232,000 purchase price (excluding furniture, machinery and equipment valued at another $24,520). Vagabond's February 15 email [Ex.12(H)] stated Vagabond:

> "offer[s] the following …. $1,232,000 Estimated Purchase Price. … We can show proof of funds if the bank [North Mill] needs it." [Ex. 53A (Haas Tr.85:24-86:14)]

North Mill does not dispute that under that Vagabond "offer", Wilton would be paid approximately $898,000 at closing and another $337,000 shortly thereafter (from collection of the balance of Wilton receivables but without charge for collection costs) [Ex.s 12(I) and Q §4(a), (b) & (c)].[6] Moreover, Vagabond stated willingness to consider a "counter-offer" [Ex. 12I].

North Mill does not dispute that Jeffery's February 24, 2016 email acknowledged his willingness to accept that Vagabond "offer" if it could complete acquisition of Wilton's assets on an expedited basis [Jeffery wrote that "I can accept the (Vagabond) offer with exception of the time line"] [Ex. 12I (pp. 1-2)]. In turn, Vagabond's February 25, 2016 email stated it could make the acquisition "happen" on as fast a "time frame" as Wilton's lender (North Mill) required [Ex. 12J]:

> "We [Vagabond House] would have been done with the Due Diligence by now if the deal would have been signed when I sent the letter of intent. If the lender has a different time frame we can make it happen …"

As Vagabond's Scott Haas testified, Vagabond "understands the business"; could "do due diligence in an hour"; and had cash on hand or available to complete the transactions [Ex.s 12K and 12L (Tr. 80:2-82:3)].

Instead, North Mill agreed to fund $30,500 of Leisawitz fees [Ex.s 15A&B] and later sent its own email accepting Gordon Brothers' "expression of interest" to purchase

---

[6] Vagabond's proposal [Ex. 12(I)] would pay Wilton at closing $898,667, including for inventory $632,000 ($68,000, $540,000, and $24,000), for receivables $166,667 (one-third of Wilton's $500,000 of receivables), and $100,000 for goodwill/intangibles.

6

Wilton's non-real estate assets for only $725,000 pursuant to terms, provisions, and conditions not yet defined or agreed but instead to be negotiated [Ex.s 16 and 41].

North Mill does not dispute that Leisawitz' March 2, 2016 email to North Mill objected to Gordon Brother's $725,000 price, as "significantly less than" the value of Wilton's inventory and receivables (before taking into account value of Wilton's brand name, trademarks, and other rights), but stated Jeffery would "allow" that below-market sale to Gordon Brothers (all proceeds payable to North Mill), if Jeffery receives an "upside" from North Mill (rather than negotiating a better price for benefit of Wilton and its creditors). That email from Phillips of Leisawitz to North Mill stated [SUMF #BBB]:

> "The concept that I [Phillips] discussed with North Mill was **that in exchange for the Junior Participant and owner's consent** [the consent of sole shareholder, sole director, officer and fiduciary Jeffery] **to allow the assets to be sold to Gordon Bros. for the price of $725,000 (which amount Mr. Jeffery believes is significantly less than what the collection of the AR's and sale of inventory would bring), there had to be some upside for** the Junior Participant [Jeffery].
> ....the remaining proceeds [from sale of the Wilton real estate] would be paid 80% to NM and 20% to the Junior Participant [Jeffery].
> ...**If North Mill insists on changing the deal, then the Borrower [Wilton] will not consent to the Gordon Brothers transaction.**" [emphasis added]

So North Mill knew that even fiduciary Jeffery believed the $725,000 sale price to Gordon Brothers was "significantly less than what the collection of the accounts receivable and sale of inventory would bring" -- before even taking into account the value of Wilton's brand name, trademarks, and distribution network (including major department store chains, more than 1,000 specialty retailers, and Wilton's own website).

Meanwhile after North Mill President Goldrich's February 15, 2016 telephone call with Leisawitz, Goldrich had sent his North Mill colleagues an email as to his concern that Jeffery/Leisawitz would go "rogue" [Ex. 40] – that Jeffery/Leisawitz could

7

be "uncooperative in a bankruptcy", "not turn over assets to Gordon Brothers", or not cooperate in efforts to repay North Mill in full [Ex. 59 (Tr. at 76:6-77:25)].

In fact, Wilton did have those and other alternatives – including license the brand to Artesanias or sell non-real estate assets to Vagabond or Lifetime Brands (as confirmed by Gordon Brother's resale to Lifetime Brands within three weeks and collection of approximately $1,450,000 therefrom, being double the $725,000 paid by, and resulting in a more than $457,000 profit to, Gordon Brothers) [Ex. 32].

Instead, Jeffery misused his leverage as Wilton fiduciary (sole director/CEO/sole shareholder) for his own (not Wilton's) betterment, as Tom Siska of North Mill testified:

> Q. ... Have you seen this [First Amendment to Participation Agreement] before?
> A. Yes, I have.
> Q. And how are you familiar with it?
> A. ... I was part of the negotiation to get the document to an executable form.
> Q. Okay. And what is the date of the agreement?
> A. March 7, 2016.
> Q. Okay. And if you know, in what respects does this alter the original junior participation agreement?
> A. ... it was clear to us at this time and I'm guessing to Ivan Jeffery as well that we were not going to get paid out in whole... and that was going to mean he wasn't going to receive any of his $250,000 by virtue of being junior to us. So they came to us. **Ivan Jeffery came to us and said, you know, hey, I'm probably not going to see any money, but I can make it difficult for you to collect your money. I can fight you guys in court through the foreclosure actions, so why don't we make a business deal that gets you what you want, which is an expedient liquidation, and possibly gets me something. ...**
> Q. Okay. **And what did it give Mr. Jeffery?**
> A. Well, **it gave him this agreement** ...
> Q. Well, **it gives him the right to share in the proceeds of sale under certain conditions, does it not?**
> A. **It did,** ..." [emphasis added] [Admitted by North Mill at SUMF #DDD]

With respect to negotiation of that Participation Amendment, Siska further testified:

> "Q. Do you recall the full extent of that conversation with Mr. Phillips [the Leisawitz attorney] about the Junior Participation Agreement and Mr. Jeffery?
> A. Yeah. We were going to change the terms of the junior participation payments to Ivan Jeffery given these conditions.

8

> Q. Was the idea that those terms would be changed in exchange for Mr. Jeffery not interfering with the liquidation agreement with Gordon Brothers?
> A. Yes.
> Q. Did you have a sense from that conversation with Mr. Phillips and then in the follow-up emails that we're looking at here that Mr. Phillips was representing Mr. Jeffery's interests in those negotiations?
> A. Yes." [Admitted by North Mill at SUMF Stmt. EEE]
> ...
> "Q. Was it your understanding, based on this email from Mr. Phillips [the March 2, 2016 email from Leisawitz (Ex. 18 hereto)] though that there was some concern that Mr. Jeffery would not allow the liquidation agreement to go forward if he did not have that Junior Participation Agreement amended to his liking?
> A. Yes.
> Q. Were all of the negotiations that were – that were about amendment of the Junior Participation Agreement done either by phone or email with the attorneys at Leisawitz Heller?
> A. I can't say all but certainly a lot of them, yes." [Admitted at SUMF #EEE]

Similarly with respect to North Mill's negotiation of that amendment agreement with fiduciary Jeffery, North Mill's officer Betty Hernandez testified and so admitted:

> "Q. Were you generally aware, in this time period, that the attorneys at Leisawitz Heller were effectively threatening to nix the Gordon Brothers deal if they didn't get what they wanted on the junior participant agreement with the real estate? ...
> A. Yes.
> Q. And was it your understanding that the attorneys at Leisawitz Heller were the ones that were negotiating those terms on behalf of the junior participant, Ivan Jeffery?
> A. Yes." [Admitted by North Mill at SUMF #FFF]

North Mill officer Hernandez estimated Jeffery could personally receive $134,000 for his "cooperation" in approving that below-market sale of Wilton assets [Ex.3, 14, 15 & 16].

Phillip's March 3, 2016 email further described to Jeffery the personal benefit to Jeffery (there being no benefit to Wilton) of that Amendment to his Junior Participation Agreement -- that unless Jeffery so amended his Participation Agreement with North Mill, **"any other alternative has you subordinated to both loans, full payment."** [Ex. 19 (emphasis added), SUMF #CCC]. Later, Phillips testified and so admitted with respect to the March 7, 2016 Amendment to Jeffery's Junior Participation Agreement:

9

Case 5:16-cv-04197-EGS Document 148 Filed 04/07/22 Page 11 of 11

"A. ... at the price that was offered by Gordon Brothers, there wouldn't be any flow down to his [Jeffery's] participation piece. So I suggested to them [North Mill] that they alter that so that he can participate ... if there were a sale of the real estate above the $390,000. ... [Admitted at SUMF #GGG]

"A. ... if North Mill hadn't agreed to this, then they would have collected ... a hundred percent of the sale of assets proceeds, which they did. And then they would have gotten the next 390 ... .
"Q. **In other words, Mr. Jeffery was bettering his position by getting 20 percent of the net proceeds rather than waiting until North Mill got paid in full?**
A. **Oh, sure**." [emphasis added] [Admitted by North Mill at SUMF #GGG ]

North Mill so bribed Jeffery to agree to below-market sale and breach fiduciary duty by concurrently entering into the junior participation agreement amendment (whereby Jeffery bettered his position by obtaining the right to *pari passu* payment of 20% of net proceeds of sale of Wilton's real estate rather than being subordinated to payment in full to North Mill) in consideration for his approval as director/CEO to below-market sale of Wilton non-real estate assets for only $725,000 paid to North Mill.

7. <u>North Mill Ignores the Terms of Its Forbearance and Loan Modification Agreement</u>.

North Mill ignores that its Forbearance and Loan Modification Agreement states its terms "shall prevail" over any inconsistent term or provision of the Notes and limited attorney fees and expenses payable by Wilton to reasonable fees "incurred" [SUMF #V through Z]. Instead North Mill confessed judgment for "anticipated fees and expenses" [Ex.s 48A&B], thus inflating the judgments confessed by fees not actually "incurred".

WHEREFORE, plaintiff Artesanias requests the Court GRANT its motion for summary judgment on its First Cause of Action for "aiding and abetting breach of fiduciary duty".

Date: April 7, 2022  /s/ Barry L. Goldin
BARRY L. GOLDIN, ESQ. (PA #58692)
3744 Barrington Drive, Allentown, PA 18104-1759
Tel: 610-336-6680  Email: barrygoldin@earthlink.net
*Attorney for Plaintiff Artesanias Hacienda Real S.A. de C.V.*

HAC020406.1REPLYSUMJNMC

10